### COOK and another *v.* BIDWELL.

*(Circuit Court, W. D. Pennsylvania.   July 16, 1881.)*

1. CONTRACTS—PARTIAL ASSIGNMENTS.

    Partial assignments of one's rights under a contract are not good as against the other contracting party.

2. SAME—SAME—RESCISSION BY ASSIGNEE.

    The assignee will not be allowed to work a rescission of the contract.

3. SAME—SAME—ACTION BY ASSIGNEE.

    Nor can he maintain an action against such other party without joining the assignor, unless with such party's consent.

4. SAME—SAME.

    Albert Bell entered into an agreement with the defendant, Bidwell, by the terms of which the defendant, among other things, was to manufacture a certain plow under two patents, which belonged to the defendant, and to pay the

defendant a royalty and a commission on sales made by him. Subsequently the defendant assigned to John Ball & Co. all royalty due or to become due, and his interest in the patents, as security for a debt, which right and interest were by them assigned to the plaintiffs, who pray that the defendant's license be decreed to be forfeited, and that he be required to account to them for royalties. *Held,* that as the assignment made by Albert Ball did not extend to commissions upon sales, a decree annulling defendant's license would not be granted, as it would not only affect such commissions but work a rescission of the entire agreement. *Held, further,* that as the assignment was but a partial one, the defendant could only be required to account for royalties becoming due after he had assented to it.

*Bakewell & Kerr,* for defendant.

*John Barton,* for complainants.

ACHESON, D. J.   On July 19, 1876, Albert Ball and the defendant entered into a written agreement, by the terms of which the defendant was to manufacture a plow known as the "Red Jacket Plow," under two patents of the United States which had been issued to Ball, and pay Ball on each plow made by the defendant, and "sold and collected for," a royalty of 50 cents, to be settled and paid in the months of January and July of each year; and the defendant was further to pay Ball a commission of 5 per cent. on net collections upon sales of plows made by Ball or his agents, in whatever territory he might work up, but he to pay the traveling expenses of himself and his agents, and the defendant to supply printed matter; the defendant to meet the demand from responsible parties for plows, on reasonable notice; the agreement to continue during the term of the patents, which bear date respectively, January 3, 1871, and January 4, 1876.

On January 13, 1877, by a written instrument of that date, Albert Ball assigned to John Ball & Co. "all royalty or patent fees due or to become due" to him under the above-recited agreement, this assignment to be for the term of four years from this date;" and by an instrument of writing, of the same date, he assigned all his interest in said two patents to said John Ball & Co., "subject to a contract this day executed by and between said John Ball & Co. and myself," (Albert Ball.)   By this latter contract John Ball & Co. sold their manufacturing establishment to Albert Ball for the consideration of $18,000; and the contract provided, *inter alia,* for an assignment to John Ball & Co. of the aforesaid royalty on the Red Jacket plow, and of said patents, "said assignment of said patents and royalty and license fees to be for a period of four years;" and the contract contains the further provision that if the purchase money, with interest, is not fully paid "at the end of four years, said Ball is to

pay any balance then unpaid to said John Ball & Co. within 30 days thereafter; and on full payment of said consideration the patents aforesaid and herein mentioned are to be assigned by said John Ball & Co. to said Albert Ball, his heirs or assigns."

On the fifteenth of February, 1878, John Ball & Co. assigned all their interest and claim in said patents, and in the aforesaid agreement between Albert Ball and the defendant, to George Cook and Jacob Miller.

On the nineteenth of November, 1878, Cook and Miller served a written notice upon the defendant, in which, after reciting that he had failed to comply with the "conditions of said license" to manufacture plows under said patent, "in not paying the royalties as provided by said license, there being now due and unpaid to us a large sum as royalty on said license, in which sum or amount you are now in default, and having also broken and failed to comply with other terms of said license," they notified the defendant that they terminated and annulled his license. They subsequently filed the bill in this case, in which they pray that the defendant's license may be decreed to be forfeited, that he may be enjoined from manufacturing plows under said patents, and that he may be required to account for and pay the plaintiffs' all royalties for which he may be in arrear, and damages.

The notice of November 19, 1878, assumed, and the bill assumes, that the agreement between Albert Ball and the defendant contains *conditions* for the breach of which by the defendant his license to manufacture is revocable; but the agreement contains nothing of the kind. There is no provision therein for revocation or forfeiture, and therefore there is no foundation for a decree annulling the license, (*McKnight* v. *Krentz*, 51 Pa. St. 232;) certainly none under the evidence. But, were it otherwise, such decree would not be made upon this bill, for Albert Ball, whose rights are involved, is not a party to the suit. *Gloninger* v. *Hazard*, 42 Pa. St. 389. That he has an interest in the question of annulling the defendant's license is manifest. His assignments of the patents, and of the royalties payable by the defendant, are not absolute, but merely as collateral security for a debt due by him to John Ball & Co., and they are expressly limited in their operation to the term of four years. Furthermore, an important part of the agreement between Albert Ball and the defendant, to-wit, that relating to Ball's commissions upon sales, was not touched by the assignments. Now, clearly, a decree annulling the

defendant's license would necessarily affect Ball's commissions, and, indeed, work a rescission of the entire agreement between him and the defendant.

It only remains to be considered whether the complainants are entitled to relief under their prayer for an account, and, if so, upon what principles such account is to be taken. Albert Ball testifies that he visited the defendant's office on the seventeenth of January, 1877. He says:

"I handed him a notice, from John Ball & Co., of the transfer of my rights and royalties *that had become due* under my contract with Mr. Bidwell, and, I think, in connection with that, a letter stating they had withdrawn a certain circular they had issued."

On January 27, 1877, John Ball & Co. addressed the defendant a letter, in which they say:

"You are hereby notified that Albert Ball has assigned to us all royalty or patent fees which are due, or to become due, under provisions of contract between you and him dated July 19, 1876, and that we shall look to you for payment of same to us."

To this notification the defendant replied, by letter dated January 30, 1877, in which he says:

"I take note of your notice that Albert Ball has assigned to you the royalty which may become due to him under my contract with him dated July 19, 1876, and in reply thereto have to state that the amount, in round figures equal to about $1,500, has already been advanced to Mr. Albert Ball, upon the royalty and commissions for selling. As I cannot know at this date how much of the amount will be applicable to commissions, I could not determine how much of it would go off the royalty. Any balance, however, which may be due upon the same, it will be equally agreeable to me to pay you at the proper time."

Under date of February 6, 1877, John Ball & Co. wrote to the defendant:

"We cannot consent that any amounts advanced to Mr. Ball after the seventeenth instant should be included in the amount held subject to royalty, as you had notice through him of the transfer to us; and amounts advanced after such notice were so done at your own risk of being taken up by commissions or otherwise by Mr. Ball."

It appears, as I understand the evidence, that on January 18, 1877, the defendant made an advance to Albert Ball of $546.40, which afterwards was reduced to $464.20. This advance the evidence shows was in accordance with previous dealings between Ball and the defendant under their agreement, and nothing in the evidence relating to the transaction indicates any intentional bad faith to John Ball & Co. Is, then, the position taken by them and by the

complainants, that this advance cannot be brought into the account between them and the defendant, tenable? I think not. The notice proved to have been given to the defendant on January 17th was of the transfer of "royalties *that had* become due;" and it does not appear that proper notice was given before the letter of January 27, 1877. But if the notice of January 17th had been ever so full, why should it have the effect claimed for it? The defendant was not a mere licensee of Albert Ball, accountable for royalty. Ball and the defendant were engaged in a joint enterprise, which was to endure while the patents were in force. And if the defendant conceived that the success of the enterprise would be promoted by an advance, why might he not make it, notwithstanding the alleged notice? Why should he be trammelled by an assignment to which he was not a party, and to which he had not yet given his consent? The assignment to John Ball & Co., it will be observed, was not the entire agreement between Albert Ball and the defendant. It was a partial assignment only. Upon what sound principle could the contract be severed by one party without the assent of the other? Say the supreme court, in *Mandeville* v. *Walch*, 5 Wheat. 286:

"A creditor shall not be permitted to split up a single cause of action into many actions without the assent of his debtor, since it may subject him to many embarassments and responsibilities not contemplated in his original contract. He has the right to stand upon the singleness of his original contract, and to decline any legal or equitable assignments by which it may be broken into fragments."

It will not do to say that Ball's royalties and commissions are distinct and separable claims. They both arise under one contract, grow out of the same enterprise, are closely connected, and properly the subject of one account. It seems to me that it is only by virtue of the defendant's assent to the assignment to John Ball & Co., given in his letter of January 30, 1877, and his subsequent recognition of the plaintiffs' rights upon the basis of that letter, that the plaintiffs can maintain this bill. In all cases where the assignment does not pass the legal title, and is not absolute and unconditional, or there are remaining rights or liberties of the assignor which may be affected by the decree, he is a necessary party. 1 Dan. Ch. 192; Story's Eq. Pl. § 153. Now, the assignment not having been absolute, and but partial, Albert Ball would be a necessary party, save for the defendant's assent; and as the plaintiffs must rely upon the defendant's assent in order to maintain this bill, they must take it with its qualification.

The case will be referred to a master, to state an account between the parties in conformity to the views herein expressed. When the balance due the plaintiffs is ascertained, we will consider whether they may not be entitled to an injunction againt the defendant until he pays the arrears of royalties so found to be due.